

# Missouri Court of Appeals

## Southern District

### Division Two

STATE OF MISSOURI, )
)
    Plaintiff-Respondent, )
)
vs. )      No. SD32459
)
JAMES CARL DUKE III, )      **Filed: April 21, 2014**
)
    Defendant-Appellant. )

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Thomas E. Mountjoy Circuit Judge

## AFFIRMED

James C. Duke ("Defendant") appeals from his convictions after a bench trial for first-degree murder and armed criminal action. *See* §§ 565.020, 571.015, RSMo (2000). Defendant presents three points on appeal: (1) the trial court clearly erred in admitting Defendant's confession into evidence; (2) the trial court abused its discretion in allowing a detective to testify he found no evidence of self-defense; and (3) the trial court plainly erred in permitting the prosecutor to discuss case law during closing argument. These arguments are without merit, and we affirm the trial court's judgment.

## Factual and Procedural Background

On March 21, 2010, Defendant shot Kody Ray ("Victim") on Victim's front porch while Victim's family was celebrating a child's birthday party inside.

Victim died as a result of a "relatively straight-through shot" just behind his ear. Ultimately, investigators developed Defendant as a suspect in the shooting, and Victim's uncle identified Defendant in a photographic line up.

On March 25, 2010, police officers arrested Defendant as he left his parents' home. Defendant was transported to the police station to be interviewed by Detective Todd King ("Detective King"). Once at the station Defendant was taken to an interview room. Detective King read Defendant his ***Miranda***[1] rights from a form. Defendant stated he understood those rights. Defendant then made a statement in which he admitted shooting Victim. Defendant explained there was a "beef" between Victim and one of Defendant's friends. According to Defendant, Victim was known to have a gun. Defendant and his friend decided Defendant would be the one to confront Victim because Defendant was the only one of their group who had a gun. Defendant claimed he did not try to kill Victim, but he thought Victim was going to pull a gun on him.

Defendant was charged with first-degree murder and armed criminal action. Defendant filed a motion to suppress the statement he made to Detective King, alleging, among other things, that his relinquishment of his ***Miranda*** rights was not knowing and voluntary. The trial court denied the motion after a hearing. Defendant then waived his right to a trial by jury and received a bench trial. The trial court found Defendant guilty as charged and sentenced Defendant to life without parole for first-degree murder and thirty years incarceration for armed criminal action. This appeal followed.

---

[1] *See **Miranda v. Arizona**,* 384 U.S. 436 (1966).

## Point I:  *Miranda*

In his first point, Defendant argues the trial court clearly erred in denying his motion to suppress the statement he made to Detective King because Defendant's relinquishment of his right to remain silent was rendered unknowing and involuntary by statements made by Detective King during the **Miranda** warning.  This argument is without merit.

When a criminal defendant files a motion to suppress, the State bears the burden of proving the motion should be denied by a preponderance of the evidence.  *See* **State v. Pennington**, 408 S.W.3d 780, 784 (Mo. App. W.D. 2013).  Appellate review of a trial court's decision regarding a motion to suppress is for clear error which will be found when the appellate court is left "with a definite and firm impression that a mistake was made." **State v. Ruff**, 360 S.W.3d 880, 885 (Mo. App. S.D. 2012) (quoting **State v. Jackson**, 248 S.W.3d 117, 121 (Mo. App. S.D. 2008)).  "In the course of our review, we consider the records of both the suppression hearing and the trial, and we view the entirety of the record before us in the light most favorable to the trial court's ruling on the motion to suppress." **Id.** (citations omitted).

Viewed in that light, the following additional facts surrounding Defendant's statement to Detective King were adduced at the suppression hearing and at trial.  After his arrest, Defendant was taken to the police station and placed in an interview room.  A short time later, Detective King entered the room and removed Defendant's handcuffs. The following exchange occurred on the video that was made of the interview:

DETECTIVE KING:  Oh, well, lots of things, lots of things going on and . . . of course you're down here.  I'm sure you've got a good idea of why you're down here.  We need to a, need to get a few things lined out because there's lots of people, lots of people telling us things and I think you probably need to get your side out there.  Ok?  So I'm going to, uh, since you're down here I'm gonna, going to advise you your rights and then we'll kind of go from there and uh get your side to the story out there.  All right?  If I didn't tell you when I walked in my name is Todd, the detective down here.  I'll, I'll shoot you straight, answer your questions the best I can, and we'll kind of go from there.  All right?

DEFENDANT:  All right.

DETECTIVE KING:  Do you like, you like to be called James or is there something else you like to be called?

DEFENDANT:  James, it don't matter.  James, JD, you can call me by my first and . . .

DETECTIVE KING:  Ok JD.  All right.  What year did you finish in school?

DEFENDANT:  Uh, 2009.

DETECTIVE KING:  Um, I mean what grade?

DEFENDANT:  Um, Twelfth.

DETECTIVE KING:  The Twelfth grade?

DEFENDANT:  Yea.

Detective King then read from a statement of rights form to Defendant.  When he finished reading the form, Detective King asked Defendant if he understood.  Defendant replied, "I think.  Um.  Only if you can't afford an attorney one will be appointed to represent you?  Is that free or do you gotta pay for that?"  Detective King told Defendant that if that were the case, "the courts will appoint, will get you an attorney."  Defendant said, "All right.  That's cool."  Then Detective King asked Defendant to sign the form to show he understood the rights.

The form was titled "Statement of Rights[.]"  The form was divided into two sections.  The upper section of the form stated as follows:

You have the right to remain silent.

Anything you say can and will be used against you in a court of law.

You have the right to talk to a lawyer before making any statement or answering any question, and you may have him present during questioning.

If you cannot afford an attorney, one will be appointed to represent you before any questioning if you wish.

You can decide at any time to exercise these rights and not answer any questions or make any statements.

The second section of the form included the printed line, "I have had the above statement of my rights read to me, and I fully understand each of them."  Defendant signed the form indicating he understood the rights.  Defendant then made his statement regarding his involvement in Victim's shooting.

At the hearing on the motion to suppress, Detective King testified Defendant appeared to comprehend what they were discussing at all times.  Detective King further stated he made no threats or promises to Defendant during the course of the interview.

Defendant's attorney also questioned Detective King regarding his advice to Defendant on the right to remain silent.  Detective King admitted the word "waiver" was not printed on the statement of rights form and that he did not use the word "waiver" in speaking with Defendant.  He testified the form used is called a statement of rights rather than a waiver of rights.

After listening to the parties' arguments and allowing them time to submit written suggestions, the trial court denied Defendant's motion to suppress.

5

"The *Miranda* Court formulated a warning that must be given to suspects before they can be subjected to custodial interrogation." *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010).  In the present case there is no dispute Defendant was subjected to custodial interrogation, so the only issue is whether Defendant's decision to relinquish his right to remain silent was knowing and voluntary.

An inquiry into whether the State has demonstrated a valid relinquishment of the right to remain silent "has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.*  The second requirement is that the relinquishment "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.  See also Thompkins*, 560 U.S. at 382-83.

Here, the first requirement was easily demonstrated.  Detective King testified he made no threats or promises to Defendant during the interview.  Other than stating he would like to hear Defendant's side of the story, there was no intimidation or deception by Detective King or anyone else.  The interview lasted less than an hour and there were no physically coercive tactics. Defendant's relinquishment of his *Miranda* rights was a free and deliberate choice.  Thus, we are left with the issue of whether Defendant knowingly relinquished his right to remain silent.

As to the second requirement, "[t]he main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent

6

and the right to counsel." ***Thompkins***, 560 U.S. at 383. "The prosecution therefore does not need to show that a waiver of ***Miranda*** rights was express." ***Id.*** at 384. For this reason, "[a]n accused's uncoerced statement after being given a ***Miranda*** warning establishes an implied waiver where the prosecution makes an additional showing that the accused *understood* the ***Miranda*** warning." ***Pennington***, 408 S.W.3d at 785.

In the present case, there was evidence showing Defendant relinquished his ***Miranda*** rights through his actions. Prior to any questioning, Detective King determined Defendant had graduated high school and understood the English language. Detective King then read the ***Miranda*** warnings from a form. Defendant said he understood and signed the form indicating he understood these rights. Defendant then began answering questions about Victim's death. These facts show Defendant was provided with ***Miranda*** warnings, Defendant understood the ***Miranda*** warnings, and Defendant made an uncoerced statement. Consequently, Defendant's actions resulted in a knowing relinquishment of his ***Miranda*** rights. *See **Thompkins***, 560 U.S. at 383.

Defendant argues the evidence does not show he understood the rights explained to him. In support he states, "[b]efore any ***Miranda*** warnings were administered, Detective King made sure to tell [Defendant] that they were going to talk about his side of the story, as if it were a foregone conclusion, and he minimized the warnings as just a formality and that they would 'get his side of the story out there' as soon as he read them." Defendant contends the use of this language was a stratagem to frustrate the purpose of the ***Miranda*** warnings. This argument is without merit for two reasons.

7

First, the argument misunderstands the nature of the knowledge required before a suspect may validly relinquish his right to remain silent. As the Supreme Court of Missouri has stated, "[t]he requirement that a waiver of rights be knowing and intelligent does not mean that a defendant must know and understand all of the possible consequences of the waiver." ***State v. Powell***, 798 S.W.2d 709, 713 (Mo. banc 1990). "Rather, it requires that the defendant understood the warnings themselves; 'that he at all times knew that he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction.'" ***Id.*** (quoting ***Moran***, 475 U.S. at 422). Here, Defendant stated he understood the rights.

Second, Defendant's argument ignores the language of the warnings themselves. The warnings included the statement, "[y]ou can decide *at any time* to exercise these rights and not answer any questions or make any statements." (Emphasis added). Defendant indicated he understood each of the rights. The content of that warning was not eviscerated by Detective King's suggestion that this was Defendant's opportunity to explain his side of the story.

Defendant also discusses ***Pennington*** in support of his conclusion that the procedure in this case was improper. He states the ***Pennington*** case disapproved the practice of "modifying and eliminating any mention of 'waiver' in their ***Miranda*** forms[.]" This statement misconstrues the facts and analysis in ***Pennington***.

The court in ***Pennington*** did have a footnote stating, "We note, however, while not mandated, the inclusion of waiver language in the ***Miranda*** form would have avoided the issue faced in this case." ***Id.*** at 785 n. 6. However, the

8

court in ***Pennington*** actually held the statement was admissible even though the form lacked the waiver language. ***Id.*** at 785-86.

The primary thrust of Defendant's argument appears to be that there was no valid relinquishment of the right to remain silent because Detective King did not use the word "waiver" during the statement of rights or the interview and did not specifically ask the Defendant if he "waived" his rights. Defendant points to no cases, and we are unable to find any cases, which hold the interrogating officer must specifically ask "Do you wish to waive your right to remain silent?" in order for the prosecution to prove a valid relinquishment of the right to remain silent. Indeed, the fact that the word "waiver" was not used does not mean a waiver did not occur under the circumstances of this case. *See* ***Thompkins***, 560 U.S. at 382-83.

In sum, Defendant was given a correct statement of his ***Miranda*** rights, Defendant stated he understood those rights, signed a form containing those rights, asked a valid question regarding one of his rights and received a valid answer. Defendant subsequently elected to go forward and make a statement. Defendant knowingly relinquished those rights. The trial court did not clearly err denying the motion to suppress.

Defendant's first point is denied.

## Point II:  Alleged Opinion Testimony

In his second point, Defendant claims the trial court abused its discretion in "allowing Detective King to testify that he did not find any evidence that the shooting was done in self-defense[.]" Defendant argues this testimony was inadmissible because it was an opinion regarding an ultimate issue in the case.

9

The following additional facts are necessary to the resolution of this claim. Near the end of the direct examination of Detective King, the prosecutor asked, "In the interview the defendant tells you that kind of like, 'It's a self-defense, I had to do it.' Did you find any evidence that this was done in self-defense?" Defendant's attorney objected, stating the answer would invade the province of the court, and the trial court sustained the objection. The prosecutor then attempted to lay a further foundation for the question, eliciting testimony that Detective King had training in what evidence to look for to substantiate a self-defense claim and that Detective King had looked for such evidence in this case. When the prosecutor again asked if Detective King found any evidence that this act was committed in self-defense, Defendant did not object or make a motion to strike.

As the State correctly argues, this claim was not preserved for appellate review. Generally speaking, to preserve a claim of evidentiary error for appellate review, a party must make an objection when that testimony is admitted at trial. *State v. Cochran*, 365 S.W.3d 628, 632-33 (Mo. App. W.D. 2012). Here, while Defendant objected the first time the prosecutor asked Detective King about evidence of self-defense, Defendant did not object when Detective King ultimately gave his testimony on the matter. As there was no contemporaneous objection, Defendant's claim regarding this evidence is not preserved for review. *See State v. McWhorter*, 240 S.W.3d 761, 763 (Mo. App. S.D. 2007) (holding that a pretrial objection alone did not preserve a claim for appellate review).

Defendant has not requested review for plain error under Rule 30.20,[2] which gives this Court discretion to review unpreserved claims of trial court error for plain error resulting in manifest injustice or a miscarriage of justice. An appellate court has complete discretion in determining whether to engage in plain error review. *State v. Edwards*, 280 S.W.3d 184, 188 (Mo. App. E.D. 2009). Plain error review should be used sparingly and does not justify a review of every error that has not been preserved for appellate review. *Id.* We decline to engage in such review here. *See id.*; *State v. Ficke*, 892 S.W.2d 814, 818 (Mo. App. S.D. 1995).

Defendant's second point is denied.

### Point III: Alleged Improper Closing Argument

In his final point on appeal, Defendant argues the trial court plainly erred in allowing the prosecutor to discuss the facts of reported cases during the State's closing argument. This argument is without merit because it fails to take into account the difference between a jury trial and a bench trial.

Defendant claims this argument was an improper discussion of facts outside the record, and each of the cases he cites in support involved an alleged argument of facts outside the record to a jury. Here, however, the argument is more properly characterized as an argument of law, and it was made to a judge sitting without a jury. Defendant cites no cases supporting the proposition that it is error for a trial judge to listen to closing arguments from a lawyer in a bench trial based on what the lawyer believes the governing law to be. Thus, we find that Defendant has failed to demonstrate any error, plain or otherwise.

---

[2] All rule references are to Missouri Court Rules (2013).

11

Defendant's third point is denied.

## **Decision**

The trial court's judgment is affirmed.

MARY W. SHEFFIELD, J. - OPINION AUTHOR

GARY W. LYNCH, J. - CONCURS

DON E. BURRELL, J. - CONCURS

12